UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 00-2082(DSD/JMM)

John L. Zenk,

Plaintiff,

v.

**ORDER**

The Paul Revere Life Insurance Company,

Defendant.

Brian J. Love, Esq. and Hauer, Farigone & Love, 5901 Cedar Lake Road South, Minneapolis, MN 55416, counsel for plaintiff.

John Harper III, Esq., Terrance J. Wagener, Esq. and Krass Monroe, 1100 South Point Center, 1650 West 82nd Street, Bloomington, MN 55431, counsel for defendant.

This matter is before the court on defendant's motion for summary judgment. Based on a review of the file, record and the proceedings herein, the court grants defendant's motion.

**BACKGROUND**

The facts in this case are undisputed. Plaintiff is a physician who received his M.D. from the University of Minnesota in 1983. From 1986 through 1995, plaintiff was employed as an internist with Hutchinson Area Health Care and the Hutchinson Medical Center. On December 17, 1990, defendant issued an

FILED 11-15-01
RICHARD D. SLETTEN, CLERK
Judgment Ent'd. 11-15-01
Deputy Clerk's Initials

insurance policy to plaintiff (the "policy").[1] The policy provided coverage if plaintiff incurred "Total Disability" and was unable to perform the "important duties" of his occupation and was under the regular and personal care of a physician.[2]

In 1992, plaintiff underwent neck surgery. After surgery, plaintiff experienced discomfort and began self-prescribing Vicodin and other narcotic painkiller medications. (Dep. John L. Zenk at 11-13.) Plaintiff continued to self-prescribe painkiller medications and became addicted to these drugs. (Id. at 19-20, 23.)

On September 30, 1998, plaintiff was confronted in his office by members of the United States Drug Enforcement Agency ("DEA"). (Id. at 27.)[3] He immediately discontinued the use of narcotic medications after that confrontation and asserts that he has not used narcotics since that date. (Id. at 22-23.) As a result of the DEA investigation, plaintiff's use of narcotic medications was

---

[1] Paul Revere Life Insurance Company Policy Number 010246333.

[2] Paragraph 1.9 of the policy specifies that:

**"Total Disability"** means that because of Injury or Sickness:

a. You are unable to perform the important duties of Your Occupation; and

b. You are under the regular and personal care of a Physician.

(Lemoine Aff., Ex. A.)

[3] It is unclear how the DEA became aware of plaintiff's use of narcotics. Plaintiff speculates that someone from his previous practice group informed the state board of medical practice and that the board notified the DEA. (Zenk Dep. at 27.)

reported to the Minnesota Board of Medical Practice (the "board"). (Id. at 27.) The board appointed a complaint review committee (the "committee") to investigate plaintiff's use of narcotic medications. Plaintiff appeared before the committee on October 30, 1998. The committee recommended that plaintiff undergo a comprehensive evaluation through the Professional Assessment Program ("PAP") at Abbott-Northwestern Hospital in Minneapolis. Plaintiff was admitted to PAP on January 18, 1999, and was discharged on January 21, 1999. (Id. at 70.)

On March 22, 1999, the assessment team of PAP issued a report containing its diagnosis and assessment of plaintiff. The primary diagnosis was that plaintiff had an "opiode dependency," and the assessment concluded that:

> Based on his current psychological and addiction assessment, Dr. Zenk should be safe to practice after he completes the intensive residential phase of treatment and demonstrates that he has initiated a solid recovery program. There was no evidence of impairment in practice.

(Id., Ex. 2.)

The assessment team recommended that plaintiff enroll in an out-state intensive residential treatment program for chemical dependency. (Id.)

In conjunction with the assessment team's report, the state licensing board committee prepared a stipulation and order for plaintiff's signature. (Id., Ex. 7.) The proposed stipulation and

order contained the assessment team's diagnosis and its conclusion that plaintiff "should be safe to practice [medicine] after he completes intensive residential treatment and demonstrates that he has initiated a solid recovery program." (Id. at 70; Ex. 7 at 3.) The proposed stipulation and order also contained a number of conditions and restrictions that were to be placed upon plaintiff's license to practice medicine in light of his abuse of narcotic medication.[4]

Because plaintiff considered some of the conditions to be unreasonable restrictions on his ability to practice medicine, he refused to execute the proposed stipulation and order.[5] (Id. at

---

[4] These conditions included: (1) the successful completion of a chemical dependency treatment program; (2) the retention of a treating physician, approved in advance by the committee to monitor and manage care provided; (3) abstinence from alcohol and all mood altering chemicals; (4) a prohibition on prescribing and administering prescription drugs for plaintiff or his family member's use; (5) submission to unannounced blood and urine tests at least six times per quarter; (6) attendance at a self-help program in support of abstinence at least once per week; (7) monthly attendance at meetings sponsored by a professional support network; (8) submission to the committee of a treatment and aftercare plan; (9) execution of medical authorizations upon request by the board; (10) retention of a work quality assessor to provide quarterly reports; (11) practice in a group setting approved in advance by the committee; (12) attendance at quarterly meetings with a board member; and (13) agree that the stipulation would remain in effect for a period of at least two years. (Zenk Dep., Ex. 7.)

[5] While plaintiff never discussed these restrictions and conditions with his colleagues and employer, they did not believe that these restrictions would have precluded or prevented him from practicing medicine when later made aware of them. (Sandler Dep. at 35, 39-40; Stein Dep. at 43-45.)

70-71.) In conjunction with his refusal to sign the proposed stipulation and order, sometime between May and July 1999, plaintiff decided to quit practicing medicine. (Id. at 51-52.) On July 18, 1999, plaintiff sent a letter to Charles Becker, the insurance agent who had sold him the policy, notifying the insurer of his decision to quit the practice of medicine. (Id., Ex. 3.)

Plaintiff continued to work full-time in his medical practice from the time he discontinued using narcotics in October 1998 through the date he terminated his employment on August 31, 1999. (Zenk Dep. at 44.) During this time period of nearly eleven months, the parties do not disagree that plaintiff's job responsibilities and workload were essentially unchanged, despite the board's investigation and plaintiff's self-stated fear of relapse. (Id. at 44). Plaintiff's wife, colleagues and employer also agree that plaintiff's job responsibilities and workload were essentially unchanged during this period of time. (Connie Zenk Dep. at 15-16; Sandler Dep. at 9; Stein Dep. at 17-18, 37.)[6]

[6] In a deposition taken in a medical malpractice case, plaintiff offered testimony concerning the effect of his drug use on his medical practice. (Dep. of John L. Zenk, dated September 12, 2000, hereinafter "Zenk Dep. II.") In response to a question concerning his ability to appreciate the effects of his use of narcotics, plaintiff responded that he was "[p]robably more qualified than most doctors" because of his work as a pharmacist prior to becoming a physician. (Zenk Dep. II at 166.) Plaintiff denied that his use of drugs caused nausea, vomiting, sedation, dizziness, headaches, lightheadedness or fatigue. (Id. at 175, 181.) Plaintiff testified that his use of narcotics did not "affect his ability to properly treat and care for his patients."
(continued...)

Both during the board's investigation and after he decided to surrender his license, plaintiff declined to pursue any chemical dependency treatment or counseling. (Zenk Dep. at 66, 68, 131.) Plaintiff testified that he "felt that [he] didn't need it." (Id. at 66.) Plaintiff also testified that regarding his decision to surrender his medical license, "the whole drug issue really didn't have a whole lot to do with it" and "I [was] ready to back away from the practice of medicine and do something else for a while." (Zenk Dep. II at 169-170.)[7]

Plaintiff filed the present claim for disability benefits with Paul Revere Insurance on or about September 28, 1999, asserting that he was disabled by virtue of his chemical dependency on and

---

[6](...continued)
(Id. at 162.) Plaintiff has also denied that he discontinued using narcotics "out of concern for his practice." (Id. at 162-163.) Rather, plaintiff explained that he quit "because the DEA told me to stop what I was doing." (Id.) Finally, in response to a question as to whether his ability "to make decisions and judgments improve[d] after [he] quit taking [narcotics]" plaintiff relied, "No. Stayed about the same." (Id. at 178.)

[7] Plaintiff further stated that "many factors weighed in on that decision [to surrender my medical license] ... I was dissatisfied with my medical practice. Kind of dissatisfied with the environment surrounding the medical community ... practicing medicine just didn't have the excitement that it used to have when I was younger. ... I was [also] getting more involved in integrative medicine [and I had] one good offer from a company here in Minneapolis to come and work for them as their medical director. I was considering that." (Id. at 169-170.)

after September 1, 1999. In November 1999, plaintiff advised a representative of defendant that he would be working but for the loss of his medical license. (Lemoine Aff., Ex. B.)[8]

In a letter dated December 8, 1999, defendant denied plaintiff's claim for disability benefits. (Id., Ex. C.) Defendant asserted that plaintiff had failed to satisfy the definition of disability under the policy. (Id.) Defendant further reasoned that the limitations and restrictions on plaintiff's ability to practice medicine were caused by factors other than injury or sickness. (Id.)

Defendant now moves for summary judgment asserting that as a matter of law plaintiff is not entitled to disability benefits because he is not disabled within the meaning of the policy. In particular, defendant asserts that plaintiff cannot establish that his inability to practice medicine is the result of a disability but rather is the result of his own decision to voluntarily relinquish his medical license. Defendant alternatively asserts that plaintiff is not entitled to recover benefits because he has not been under the regular and personal care of a physician as

---

[8] Since surrendering his medical license, plaintiff has been involved in promoting nutritional supplements, written a book on the same subject and has been employed as the Chief Medical and Scientific Director for Humanetics Corporation, a company that specializes in integrative medicine and nutritional supplements and is also the President and Medical Director of the Minnesota Applied Research Center, an independent clinical research facility. (Zenk Aff., Ex. A; Zenk Dep., Ex. 10.)

required by paragraph 1.9 of the policy. After a careful review of the record and for the following reasons, the court grants defendant's motion.

**DISCUSSION**

**A. Standard for Summary Judgment**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Fed. R. Civ. P. 56(c). A fact is material only when its resolution affects the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 250. The nonmoving party, however, may not rest upon

mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. See id. at 322-23.

**B. Plaintiff Cannot Establish A Disability**

As a general rule, an insured has the burden of proving that his loss occurred from causes within the terms of the policy. Simmons v. Orion Ins. Co., 366 F.2d 572, 574 (8th Cir. 1966); Wilson v. New York Life Ins. Co., 250 F.2d 649, 651 (8th Cir. 1958). In this case, the court concludes that summary judgment is appropriate because plaintiff fails to establish that he is disabled under the unambiguous terms of the policy.

The policy defines, in part, a "Total Disability" as occurring when, "because of Injury or Sickness: You are unable to perform the important duties of Your Occupation." (Lemoine Aff., Ex. A.) The undisputed factual record does not support plaintiff's assertion that his alleged disabling condition prevented him from performing the important duties of his occupation. See Massachusetts Mut. Life Ins. Co. v. Millstein, 129 F.3d 688, 691 (2d Cir. 1997) (providing that an impairment must result in an inability to perform the physical or mental functions necessary to perform one's

occupational duties, not merely the loss of one's professional license, before an insured may recover under a disability policy); Massachusetts Mut. Life Ins. Co. v. Oulette, 159 Vt. 187, 189 (1992) (holding that an insurance company is not liable for the loss of earned income that results from a license suspension, or other consequences of the insured's unlawful behavior, when insured is otherwise not incapable of performing his occupational duties). In particular, plaintiff fails to present any evidence that the alleged disabling conditions created any meaningful impediment to his practice of medicine or caused him to provide inadequate care to his patients. See Goomar v. Centennial Life Ins. Co., 855 F. Supp. 319, 323 (S.D. Cal. 1994) (holding that insured was not entitled to recovery under disability policy when, despite purported disability, he continued to practice medicine until his license was revoked by state board).

To the contrary, the record clearly demonstrates that plaintiff practiced medicine competently during the period of time that he was using narcotics and for nearly eleven months after he discontinued using narcotics. Plaintiff specifically testified that his performance as a physician and his ability to practice medicine were not effected by his use of narcotics.[9] (Zenk Dep. at

[9] To a question inquiring whether his use of narcotics had affected his performance as a physician, plaintiff responded, "[n]o, not in the least." (Zenk Dep. at 21.) Plaintiff also asserted that his drug use did not "affect his ability to properly (continued...)

21.) Plaintiff also testified that he practiced competently for nearly eleven months after he quit using narcotics. (Zenk Dep. II at 178.) It is undisputed that during the period after he quit using narcotics, the nature and schedule of his practice remained unaltered. (Zenk Dep. at 44; Connie Zenk Dep. at 15-16; Sandler Dep. at 9; Stein Dep. at 17-18, 37.) Simply put, there is no evidence here that plaintiff's narcotic use, or purported fear of relapse, adversely affected his medical practice between the time he was diagnosed with chemical dependency and the time he decided to voluntarily surrender his license several months later. See Millstein, 129 F.3d at 691; Goomar, 855 F. Supp. at 323; Oullette, 159 Vt. at 190.

Thus, the court must conclude that plaintiff's inability to practice medicine is the result of his own decision to voluntarily relinquish his license, not from any purported disability arising from chemical dependency.[10]

**C. Legal Disability versus Factual Disability**

The court also believes that defendant is entitled to summary judgment because plaintiff's "legal disability" precludes

[9](...continued) treat and care for his patients." (Zenk Dep. II at 162.)

[10] While defendant also argues that plaintiff's four office visits to an internist fails to satisfy the "regular and personal care" requirements of the policy, the court will not address this argument given its decision to grant defendant summary judgment on the basis discussed.

him from recovering benefits under the policy. Disability insurance policies provide coverage for factual disabilities, such as those due to sickness or injury, and not for legal disabilities. See BLH v. Northwestern Mut. Life Ins. Co., 92 F. Supp. 2d 910, 915 (D. Minn. 2000); Allmerica Fin. Life Ins. & Annuity Co. v. Llewellyn, 943 F. Supp. 1258, 1259 (D. Ore. 1996) (holding that an insured chiropractor who lost his license for ethics violations could not recover since he was legally disabled at time he became factually disabled). This rule is illustrated by cases where the insured is unable to work because of a professional license revocation or the legal consequences associated with unlawful behavior. See, e.g., Solomon v. Royal MacCabees Life Ins. Co., 622 N.W.2d 101, 102-104 (Mich. Ct. App. 2000) (holding that there is no coverage for insured physician who continued to treat patients after he claimed to be disabled since his purported disability did not prevent him from performing the substantial and material duties of his occupation and his inability to practice medicine resulted from his decision to surrender his medical license); Millstein, 129 F.3d at 690 (holding that a chemically dependent lawyer was not entitled to recovery under a disability policy when "he still has the ability to perform legal work, but is only prevented from doing so by the loss of his license."); Oullette, 159 Vt. 192 (summary judgment appropriate for insurance company when insured failed to show that he was disabled under the policy when he continued to

perform all the duties of his profession for ten years despite his "disability," and since the court concluded that, "[insured] could still be practicing [medicine] had he not surrendered his license ... his inability to practice optometry was caused by the legal consequences of his behavior and not by a disability.").

Here, the record clearly reflects that plaintiff's ability to practice medicine was not significantly limited by any alleged disability arising from his use of, and subsequent decision to quit using, self-prescribed narcotics. Furthermore, the state licensing board specifically determined that plaintiff could continue to practice medicine so long as he agreed to abide by several enumerated conditions and restrictions. (See Zenk Dep., Ex. 7.) Plaintiff's ability to practice medicine only ceased when he decided to *voluntarily* surrender his medical license.[11] See Solomon, 622 N.W.2d at 106 (no recovery for insured when "not until plaintiff decided to voluntarily surrender his license was he unable to carry out the duties of his regular occupation.").[12] Accordingly, the court must conclude that plaintiff's inability to

---

[11] Plaintiff has also testified that his decision to surrender his license was the result of his dissatisfaction with the practice of medicine, and at a time that he was aware of other career opportunities including another job offer. (Zenk Dep. II at 169-170.)

[12] The voluntary nature of plaintiff's decision to quit practicing medicine is also discernible from his refusal to execute the board's stipulation and order that would have allowed him to continue to perform the important duties of his occupation but with some reasonable conditions in light of his previous narcotic use.

practice medicine is the result of a legal disability for which benefits are unavailable under the present policy.

**CONCLUSION**

For the foregoing reasons, **IT IS HEREBY ORDERED** that defendant's motion for summary judgment is granted, and plaintiff's claims are dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Dated: November 14, 2000

David S. Doty, Judge
United States District Court

**Please forward this announcement to the recipient of this fax.**

---

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

**For additional information on either program please visit our website at www.mnd.uscourts.gov.**

---

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.